# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# COLUMBIA DIVISION

| | |
|---|---|
| Judith Heilich, Scott Weyant, and Fort Jackson Masonic Lodge No. 374, AFM, <br><br> Plaintiffs, <br> v. <br><br> United States of America, <br><br> Defendant. | Civil Action No.: 3:16-cv-03054-JMC <br><br> **ORDER AND OPINION** |
| Sun Suk d/b/a Saky Japanese Restaurant, LLC, Jannette Fisher Spires, Tommie A. Spires, Jr., Ramone M. Jackson d/b/a Professional Cuts, LLC, and Olga Mazyck d/b/a Natural Beauty Salon, <br><br> Plaintiffs, <br> v. <br><br> United States of America, <br><br> Defendant. | Civil Action No.: 3:17-cv-02674-JMC <br><br> **ORDER AND OPINION** |

Plaintiffs above-named collectively filed these related actions seeking money damages from Defendant United States of America (the "Government") for the destruction caused to their homes by flood water freed when it breached the Semmes Lake and Lower Legion Lake Dams at Fort Jackson (South Carolina) army installation in October 2015. *See Heilich v. United States*, C/A No. 3:16-cv-03054-JMC, ECF No. 1 (D.S.C. Sept. 8, 2016) ("*Heilich*"); *Sun Suk v. United States*, C/A No. 3:17-cv-02674-JMC, ECF No. 1 (D.S.C. Oct. 4, 2017) ("*Sun Suk*").

This matter is before the court by way of the Government's Motions to Dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction.

1

(ECF No. 82 (*Heilich*); ECF No. 59 (*Sun Suk*).[1]) Specifically, the Government seeks dismissal of the instant actions based on the court's Order entered in related cases on September 27, 2018 (the "September Order"), which held that the discretionary function exception precluded the exercise of subject matter jurisdiction under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671–2680, and resulted in the dismissal of Plaintiffs' Complaints for lack of jurisdiction. *See Cohen v. United States*, C/A No. 3:16-cv-01489-JMC, ECF No. 186 (D.S.C. Sept. 27, 2018) ("*Cohen*"); *Brown v. United States*, C/A No. 3:16-cv-03053-JMC, ECF No. 131 (D.S.C. Sept. 27, 2018) ("*Brown*"); and *Kings Grant Owners Ass'n, Inc. v. United States*, C/A No. 3:17-cv-00289-JMC, ECF No. 117 (D.S.C. Sept. 27, 2018) ("*KGOAI*").[2] Plaintiffs oppose the Government's Motions arguing that the testimony of its Rule 30(b)(6) designated representative, Lieutenant Colonel ("LtCol") Richard T. Childers of the United States Army Corps of Engineers, demonstrates the inapplicability of the discretionary function exception. (ECF No. 86 at 2–9.) For the reasons set forth below, the court **GRANTS** the Government's Motions to Dismiss.

## I. RELEVANT BACKGROUND TO PENDING MOTIONS

In the September Order, the court provided a thorough recitation of the relevant factual and procedural background of the related above-referenced matters. The portions of that background which are relevant to the instant actions are included as follows:

> Fort Jackson spans 52,000 acres and serves "as the U.S. Army's main production center for Basic Combat Training." *U.S. Army Training Center, Fort Jackson*, http://jackson.armylive. dodlive.mil/about/ (last visited Sept. 18, 2018). . . . Semmes Lake and Lower Legion Lake are bodies of water "located completely within the boundaries of Fort Jackson's Military Reservation and, as such, are

---

[1] The court observes that the Government filed the same Motion in both actions. (*See* ECF No. 82 (*Heilich*); ECF No. 59 (*Sun Suk*).) Additionally, Plaintiffs filed the same Memorandum in Opposition to Defendant's Motion to Dismiss in both actions. (*See* ECF No. 86 (*Heilich*); ECF No. 64 (*Sun Suk*).) Accordingly, the court will only cite hereinafter to documents filed in *Heilich*.

[2] Because the same documentation was generally filed in all three actions, the court will only cite to documents filed in *Cohen*.

owned by the Federal Government." *Environmental Assessment: Replacement of Semmes Lake Dam*, http://www.sac.usace.army.mil/Portals/43/docs/milcon/ Semmes%20Lake% 20Draft %20EA.pdf?ver=2017-08-11-152050-713 (last visited Sept. 19, 2018); *Environmental Assessment: Upper and Lower Legion Lakes Repairs*, http://www.sac.usace.army.mil/Portals/43/docs/milcon/Final%20 Legion%20Lakes%20EA.pdf?ver=2017-08-31-145359-603 (last visited Sept. 25, 2018).

The Semmes Lake Dam is an earthen dam that impounds the waters from the Semmes Lake. *Id.*; (*see also* ECF No. 114 at 21). "The Semmes Lake Dam was reportedly constructed in the 1930s by National Guard personnel to provide recreation for the installation." (ECF No. 114 at 11.) "Semmes Lake Dam is located near the southern boundary of the Fort Jackson Reservation limits on Wildcat Creek." (ECF No. 103-11 at 4.) "The structural height [of the Semmes Lake Dam] is 27 f[ee]t, [] the crest length is 970 f[ee]t[ , . . . and] [t]he normal reservoir capacity is 329 acre-f[ee]t." (ECF No. 103-15 at 6.)

The Lower Legion Dam is an earthen dam that impounds the waters from the Lower Legion Lake. (ECF No. 114-1 at 5); *see also Environmental Assessment: Upper and Lower Legion Lakes Repairs*, http://www.sac.usace.army.mil/Portals /43/docs/milcon/Final%20Legion%20Lakes%20EA.pdf?ver=2017-08-31-145359 -603 (last visited Sept. 25, 2018). "The Lower Legion Lake Dam . . . was constructed in the late 1950s to supply water to the Fort Jackson golf course." (ECF No. 114 at 11.) The "Lower Legion Lake Dam is located on a tributary to Wildcat Creek within Fort Jackson." (ECF No. 114-1 at 5.) However, Fort Jackson generally does not consider the Lower Legion Lake Dam to be an actual dam.[3] (*Id.* at 15.) The structural height of the Lower Legion Lake Dam is 12 feet, the crest length is 500 feet, and the normal reservoir capacity is 37 acre-feet. (ECF No. 114-1 at 8–9.)

In September 1997, the Savannah District Army Corps of Engineers drafted an Emergency Action Plan ("EAP") for the Semmes Lake Dam. (ECF No. 103-11.) The EAP was deemed necessary because the Semmes Lake Dam had a hazard classification of "significant, meaning the failure of the dam would likely not cause loss of life but could cause appreciable economic loss." (*Id.* at 4 ("State and federal guidelines . . . dictate that dams with high hazard classifications should have Emergency Action Plans.").) In the EAP, the Corps of Engineers observed:

---

[3] AR 420-1 defines a dam as "any artificial barrier, including appurtenant works, which impounds or diverts water, and which is either—(1) Twenty-five feet or more in height from the natural bed of the stream or watercourse measured at the downstream toe of the barrier or from the lowest elevation of the outside limit of the barrier if it is not across a stream channel or watercourse, to the maximum water storage elevation. (2) Has an impounding capacity at maximum water storage elevation of 50 acre feet or more." (ECF No. 103-3 at 4–5 § 7-45.)

> The Phase I inspection report of Semmes Lake concluded that Semmes Lake Dam was 'small' size, based on dam height and storage volume, and 'high hazard, based on downstream development in the flood plain. However, the Phase II inspection conducted by the U.S. Army Corps of Engineers, Savannah District, resulted in the hazard classification being changed to significant because the threat of loss of life is low. The significant hazard classification is supported by the flood hazard analysis performed for this plan. The appropriate Spillway Design Flood[4] (SDF) was determined to be ½ the PMF.[5]

(*Id.* at 9.) The Corps of Engineers further determined that "[t]he existing spillway is adequate to pass only about 25 percent of the PMF (10.8 inches of rain in 24 hours) and should be upgraded." (*Id.* at 11.)

On May 1, 2000, the Department of the Army ("DA") published AR 420-72 (effective June 1, 2000), which established among other things that: (1) Army dams are classified "according to their size and hazard potential"; (2) "Army dams at all CONUS[6] installations will be maintained at or above the minimum condition levels of host State and as specified herein and in the above referenced FEMA[7] documents"; (3) "[a]ll dams must be maintained to allow passage of the design flows (flood) without major deterioration of dam components or damaging erosive or undermining action, nor loss of stability"; (4) "[f]inal decision responsibility on the design flood/risk analysis shall be the decision of the dam owner, the installation commander"; and (5) an EAP "shall be prepared for each high and significant hazard installation dam." (ECF No. 103-4 at 4 § 5-3; 5 §§ 5-5, 5-6; 7 § 5-15.)

---

[4] According to Plaintiffs' expert Dr. W. Allan Marr, "[t]he design flood of any dam is the flow rate and volume at which the dam must be maintained to allow passage of the design flows (flood) without major deterioration of dam components, damaging erosive undermining action, or loss of stability." (ECF No. 126-6 at 2.) "The selection of the design flood should be based on an evaluation of the relative risks and consequences of flooding, under both present and future conditions." (*Id.*)

[5] "PMF" is Probable Maximum Flood, which "means the largest flood that theoretically could occur at a given site during our present geological and climatic era." S.C. Code Ann. Regs. 72-1(R) (2012). "The initiating event in a PMF determination is the PMP." *Id.* "'Probable Maximum Precipitation' (PMP) means the theoretically greatest-depth of precipitation for a given duration that is physically possible over a given area at a given time of year; these projected maximum precipitation numbers are arrived at by the National Weather Service by studying actual storm events that have occurred in similar climatic areas." *Id.* 72-1(Q). "The 50 percent of PMF flood simulated represents 18.8 inches of rain over 24 hours, 6.5 inches during the maximum hour." (ECF No. 103-11 at 11.)

[6] "CONUS" means the Continental United States. (ECF No. 152 at 11 n.7.)

[7] "FEMA" is the acronym for the Federal Emergency Management Agency.

Between October 16, 2006, and March 31, 2008, the "Semmes Lake Dam and its spillway underwent major repairs and alterations." (ECF Nos. 113 at 16, 114-6 at 19.) The following safety modifications were made to the dam: "Remove existing primary spillway (outlet works) inlet structure, 24-inch diameter conduit, and dissipation basin[;] Construct a new primary spillway (outlet works) inlet structure, 48-inch diameter conduit, and dissipation basin; Excavate approximately 1/5 of the dam embankment to replace the primary spillway and reconstruct embankment[][;] Armor the upstream slope of the dam embankment with riprap stone[][; and] Remove the emergency spillway chute, and construct a new concrete spillway chute and plunge pool." (ECF No. 114-6 at 19.)

On February 12, 2008, the Department of the Army published AR 420-1 (effective February 19, 2008), which established among other things that: (1) "[c]lassification of each installation's dams shall be reviewed and validated every 2 years by the garrison commander"; (2) "Army dams will be maintained at or above the minimum condition levels of host state or host nation and as specified herein"; (3) "[a]ll dams must be maintained to allow passage of the design flows (flood) without major deterioration of dam components or damaging erosive or undermining action, nor loss of stability"; (4) "[f]inal decision responsibility on the design flood and risk analysis shall be the decision of the dam owner, the garrison commander"; (5) "[t]he garrison commander shall ensure that an EAP is prepared for each high and significant hazard installation dam"; and (6) "[i]In providing . . . dam safety services, Army garrisons will comply with all applicable Federal laws and regulations." (ECF No. 103-3 at 5 §§ 7-46, 7-47; 6 § 7-54; ECF No. 126-2 at 9 § 7-5(a).)

On April 9, 2009, the DA published DA Pamphlet 420-1-3 to provide "guidance for project planning and execution, maintenance, repair, minor construction, and control of . . . dams." (ECF No. 103-9.) Regarding dam maintenance, Pamphlet 420-1-3 advised that:

> A good maintenance program will protect a dam against deterioration and prolong its life. A poorly maintained dam will deteriorate and can fail. Nearly all the components of a dam and the materials used for dam construction are susceptible to damaging deterioration if not properly maintained. A good maintenance program provides not only protection for the owner, but for the general public as well. Furthermore, the cost of a proper maintenance program is small compared to the cost of major repairs or the loss of life and property or potential liability for such losses. A garrison commander should develop a basic maintenance program based primarily on systematic and frequent inspections. . . . Safety deficiencies must be addressed immediately by either lowering the pool or correcting the deficiency. Garrison commanders may be held personally liable for the safety of the dams under their authority and must fund projects to correct the deficiencies . . . . Earthen dams will have vegetation properly controlled and mowed, seepage will be constantly observed and controlled, and erosion repaired. Spillways will

be properly maintained and erosion repaired. Outlets will be maintained and controls tested annually.

(ECF No. 103-9 at 7 § 6-4.)

On November 16, 2009, Corps of Engineers personnel inspected the Semmes Lake Dam and determined that the dam was in fair condition, but recommended the removal of specified shrubbery, vegetation, trees, and stumps. (ECF No. 103-15 at 6.)

In June of 2010, the Corps of Engineers prepared another EAP for the Semmes Lake Dam. Because it determined that the dam's hazard classification was again "significant," the Corp of Engineers made the following observations in the EAP:

> One half of the Probable Maximum Precipitation (PMP) is the required design storm under the South Carolina Rules for Dam Safety for Semmes Lake Dam. This is based on the significant hazard classification of the dam. Significant hazard dams are described as any dam where there is no probable loss of human life, but a possible economic loss, environmental change, or disruption of lifeline facilities. There is potential hazard to the commercial offices along Marion Ave as well as several houses along N. Kings Grant Dr. Semmes Lake Dam is classified as a small dam, with 329 acre-feet of normal pool storage, 970 feet long, and 27 feet in height.

(ECF No. 103-12 at 8.)

During a four day period from October 2–5, 2015, a historic storm event occurred across South Carolina causing "rainfall totals in the Columbia area [to] exceed[] the 1,000-year recurrence intervals as referenced to the point precipitation frequency estimates in NOAA Atlas 14[8] (CISA, 2015)." *Environment Assessment: Replacement of Semmes Lake Dam*, http://www .sac.usace.army.mil/Portals/43/docs/milcon/Semmes%20Lake%20Draft%20EA.p df?ver=2017-08-11-152050-713 (last visited Sept. 17, 2018). "Two rainfall gauges on the Fort . . . recorded a maximum 24-hour rainfall of 13.4 inches from 8 pm on 3 October 2015 to 8 pm on 4 October 2015 from the storm event." (ECF No. 114 at 13.) The flooding caused by the historic storm event breached both the Semmes Lake Dam and the Lower Legion Lake Dam. (*Id.* at 11–12.)

On October 21, 2015, Fort Jackson contacted the Corps of Engineers Risk

---

[8] "NOAA" is the acronym for the National Oceanic and Atmospheric Administration. The "NOAA Atlas 14" is "intended as the official documentation of precipitation frequency estimates and associated information for the United States." *NOAA Atlas 14*, https://www.nws.noaa. gov%2Foh%2Fhdsc%2FPF_ documents%2FAtlas14_Volume1.pdf&usg=AOvVaw2DQBGo3Vs317O8rFkUZs rp (last visited Sept. 27, 2018).

Management Center ("RMC") seeking an independent assessment "regarding the failure of Semmes Lake Dam, Lower Legion Dam, . . . following the extreme storm event that occurred on 4 October 2015." (ECF No. 114 at 17.) On August 26, 2016, the RMC produced a document titled October 2015 Storm Event Independent Technical Review ("ITR"). (ECF Nos. 114–114-20.) In the ITR, the RMC expressly observed that the maximum rainfall record was 13.4 inches in 24-hours and both the Semmes Lake Dam and Lower Legion Lake Dam failed because of overtopping.[9] (ECF No. 114 at 13, 15.) In addition, the RMC observed that (1) "Semmes Lake Dam was not managed in accordance with Army regulation and guidance for dams (including AR 420-1 and DA Pam 420-1-3) that address inspection, maintenance, safety, and performance"; (2) "DHEC[10] regulations expressly exempt dams owned or operated by an agency of the Federal government"; (3) "the dam could not pass 50% of the PMF without overtopping"; and (4) "Lower Legion Lake Dam likely would have overtopped for the 4 October 2015 storm event regardless if it met the hydrologic requirements for its size and hazard category." (ECF No. 114 at 13–15.)

(*See* ECF No. 186 at 3–9 (*Cohen*).)

Because they believed damage to their real and personal property occurred as a result of the Government's breach of specified duties owed to them that resulted in "the failure of the Semmes Lake dam and Lower Legion Lake dike" (*see* ECF No. 1 at 8–9 ¶ 60), Plaintiffs filed Complaints against the Government for negligence. (*Id.* at 8 ¶ 54–10 ¶ 65.) After amending the Complaint to add additional parties (ECF No. 10), the parties conducted extensive discovery, including the Rule 30(b)(6) deposition of LtCol Childers on September 25, 2018. (*See* ECF Nos. 86-2.)

While the litigation in the instant actions was ongoing, the court entered the September Order in *Cohen*, *Brown*, and *KGOAI*, finding that the conduct challenged by Plaintiffs fell under the discretionary function exception of the FTCA. (ECF No. 186 at 22 (*Cohen*) (referencing 28 U.S.C. § 2680(a)).) As a result, the court granted the Government's Motion to Dismiss,

---

[9] "Overtopping" is "[a] condition that occurs when the elevation of the still-water level and/or associated waves, wind setup, or surge exceeds the top of the dam or levee system." *Guidance for Emergency Action Plans, Incident Management and Reporting, and Inundation Maps for Dams and Levee Systems*, https://www.publications.usace.army.mil/LinkClick.aspx?fileticket= wPpTpqGfUYQ%3D&tabid=16426&portalid=76&mid=31387 (last visited Sept. 25, 2018).

[10] "DHEC" refers to the South Carolina Department of Health and Environmental Control.

dismissed Plaintiffs' Complaints, and found that it was "without jurisdiction to review the merits of Plaintiffs' Motion for Summary Judgment and the Government's Motion for Summary Judgment." (*Id.* at 22–23 (*Cohen*).) In reaching this determination, the court made the following observations in the September Order:

> "The FTCA excludes discretionary functions from its waiver of sovereign immunity." *Johnson v. United States*, C/A No.: 5:17-cv-00012, 2018 WL 4169141, at *3 (W.D. Va. Aug. 30, 2018) (citing 28 U.S.C. § 2680(a)). "This discretionary function exception provides that the sovereign immunity waiver does not apply to: any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of the federal agency or an employee of the Government, whether or not the discretion involved be abused." *Id.* (quoting § 2680(a)).

. . .

> "To state a claim under the FTCA, a plaintiff has the burden of stating a claim for a state-law tort and establishing that the discretionary function exception does not apply." *Spotts v. United States*, 613 F.3d 559, 569 (5th Cir. 2010) (citation omitted). If the exception does apply, the court "must dismiss the affected claims for lack of subject matter jurisdiction." *Indem. Ins. Co. of N. Am. v. United States*, 569 F.3d 175, 180 (4th Cir. 2009) (citing *Williams v. United States*, 50 F.3d 299, 304–05 (4th Cir. 1995)). In *Indemnity Insurance*, the United States Court of Appeals for the Fourth Circuit provided the following summary of the test used to determine the applicability of the discretionary function exception:
> 
> > "To determine whether conduct by a federal agency or employee fits within the discretionary function exception, we must first decide whether the challenged conduct 'involves an element of judgment or choice.'" *Suter v. United States*, 441 F.3d 306, 310 (4th Cir. 2006) (quoting *Berkovitz v. United States*, 486 U.S. 531, 536, 108 S. Ct. 1954, 100 L.Ed.2d 531 (1988)). "[T]he discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow" because "the employee has no rightful option but to adhere to the directive." *Berkovitz*, 486 U.S. at 536, 108 S. Ct. 1954.
> > 
> > If we determine that the challenged "conduct does involve such discretionary judgment, then we must determine 'whether that judgment is of the kind that the discretionary function exception was designed to shield,' *i.e.*, whether the challenged action is 'based on considerations of public policy.'" *Suter*, 441 F.3d at 311 (quoting *Berkovitz*, 486 U.S. at 536–37, 108 S. Ct. 1954). Critical to proper analysis, this inquiry

8

focuses "not on the agent's subjective intent in exercising the discretion . . ., but on the nature of the actions taken and on whether they are susceptible to policy analysis." *United States v. Gaubert*, 499 U.S. 315, 325, 111 S. Ct. 1267, 113 L.Ed.2d 335 (1991). Thus, "in the usual case" a court should "look to the nature of the challenged decision in an objective, or general sense, and ask whether that decision is one which we would expect inherently to be grounded in considerations of policy." *Baum v. United States*, 986 F.2d 716, 721 (4th Cir. 1993). "Moreover, when a statute, regulation, or agency guideline permits a government agent to exercise discretion, 'it must be presumed that the agent's acts are grounded in policy when exercising that discretion.'" *Suter*, 441 F.3d at 311 (quoting *Gaubert*, 499 U.S. at 324, 111 S. Ct. 1267).

*Indem. Ins. Co.*, 569 F.3d at 180.

In these cases, Plaintiffs assert that the Government is liable for their damages because it negligently failed to operate the Semmes Lake Dam with a ½ PMF[11] and failed to conduct required maintenance on both dams at issue in this litigation. "[A] safety or engineering standard operates to remove discretion under the FTCA when it is embodied in a specific and mandatory regulation or statute which creates clear duties incumbent upon the governmental actors." *Kennewick Irr. Dist. v. United States*, 880 F.2d 1018, 1026 (9th Cir. 1989). "A general statutory duty to promote safety . . . would not be sufficient." *Id.* (citing *Allen v. United States*, 816 F.2d 1417, 1421 (10th Cir.1987) (broad and general duty imposed by statute on Atomic Energy Commission to promote safety in atomic testing left room for exercise of discretion)). "[D]iscretion [also] may be removed by a specific mandatory governmental policy duly adopted under authority delegated by statute or regulation." *Id.*

. . .

In considering the applicability of the mandatory standard element of the discretionary function exception as to the failure to operate the Semmes Lake Dam at ½ PMF, Plaintiffs assert that the Government's conduct could not have involved an element of choice because action was mandated by Army Regulations. (ECF No. 152 at 8.) Moreover, Plaintiffs contend that, due to the language in the Army Regulations that suggests an adherence to state regulations,

---

[11] "PMF" is Probable Maximum Flood, which "means the largest flood that theoretically could occur at a given site during our present geological and climatic era." S.C. Code Ann. Regs. 72-1(R) (2012). "The initiating event in a PMF determination is the PMP." *Id.* "'Probable Maximum Precipitation' (PMP) means the theoretically greatest-depth of precipitation for a given duration that is physically possible over a given area at a given time of year; these projected maximum precipitation numbers are arrived at by the National Weather Service by studying actual storm events that have occurred in similar climatic areas." *Id.* 72-1(Q). "The 50 percent of PMF flood simulated represents 18.8 inches of rain over 24 hours, 6.5 inches during the maximum hour." (ECF No. 103-11 at 11.)

9

the Government was also mandated to follow DHEC regulations. (*Id.* at 11.) The relevant language contained in Army Regulation ("AR") 420-72 specifies that Army dams "must be maintained *at or above* the minimum condition levels of [the] host State . . ." (emphasis added). (ECF No. 103-4 at 5 § 5-5.) While the court agrees that AR 420-72 instructs the garrison commander to reference state law requirements, the addition of "at or above" in the regulation implies that the garrison commander has a level of discretion. Semmes Lake Dam, at the time of the flood, was classified as a significant hazard dam. (ECF Nos. 103-12 at 11, 140-1 at 13.) Under South Carolina Regulations, a dam owner must maintain their spillway-capacity design inside the applicable Table 1 range. *See* S.C. Code Ann. Regs. 72, Table I. However, if the owner can justify the design to DHEC's satisfaction, the spillway-capacity can fall outside of the applicable table range. *Id*. Therefore, the South Carolina Regulations, similar to AR 420-72, contain an implied element of discretion. The ability to choose any level contained in the applicable Table 1 range offers dam owners, and in this situation the garrison commander, a level of discretion.

In addition to the aforementioned, there is not a federal statute, regulation, or policy that specifically prescribes a PMF of ½ for the Semmes Lake Dam. *E.g.*, *Baum*, 986 F.2d at 720 ("The inquiry boils down to whether the government conduct is the subject of any mandatory federal statute, regulation, or policy prescribing a specific course of action."). ARs 420-1 and 420-72 do not impose a course of conduct so specific as to require the ½ PMF asserted by Plaintiffs. *E.g.*, *Fanoele v. United States*, 975 F. Supp. 1394, 1398–99 (D. Kan. 1997) ("[O]nly if a 'specific and mandatory regulation, statute or policy requires a particular course of action' will a government employee's conduct not fall within the discretionary function exception.") (citation omitted). These Army Regulations leave the final decision responsibility for any flood and risk analysis to the discretion of the garrison commander. (S*ee, e.g.*, ECF No. 103-3 at 5 § 7-47(c).) In actuality, the only "federal" documents in the record that reference ½ PMF are the 1997 and 2010 EAPs.[12] However, after consideration of the entirety of the record and after review of additional online sources, the court cannot conclude that an EAP constrains the dam owner's actions "in such a way that he had no discretion but to act only a certain way." *PNC Nat'l Ass'n v. U.S. Army Corps of Eng'rs*, Case No. 2:13-CV-374 JVB, 2018 WL 1531790, at *3 (N.D. Ind. Mar. 29, 2018).

. . .

Upon the court's review, EAPs appear to provide general directives for the purpose of dealing with dam safety emergencies "to prevent the loss of life and/or property" (*see, e.g.*, ECF No. 103-11 at 5(e)), but allow the dam's owner to maintain his or her broad discretion. Therefore, the court finds that neither the EAPs nor any other "federal" statute, regulation, or policy in the record mandate a ½ PMF. Accordingly, the decision to operate and/or maintain the Semmes Lake Dam at a specified PMF involved an element of judgment or choice.

---

[12] "EAP" is the acronym for emergency action plan.

. . .

>Plaintiffs claim that the Government failed to conduct required maintenance on the Semmes Lake Dam and the Lower Legion Lake Dam. In their filings, Plaintiffs rely heavily on DA Pamphlet 420-1-3 to support their position regarding the existence of mandatory federal law regarding dam maintenance. However, based on the law cited by the Government, it is clear to the court that DA Pamphlet 420-1-3 cannot serve as mandatory federal law specifically prescribing a course of action as it relates to dam maintenance. In this regard, without DA Pamphlet 420-1-3, Plaintiffs fail to carry their burden of persuading the court that there are federal statutes, regulations, or policies that specifically govern dam maintenance thereby removing the element of judgment or choice from the Government's actions.

. . .

>As to the public policy analysis element of the discretionary function exception, the court observes that Plaintiffs' arguments do not demonstrate that the Government's failure to either operate the Semmes Lake Dam with a ½ PMF or conduct specified maintenance on the Semmes Lake Dam and/or the Lower Legion Lake Dam was a decision made outside of the scope of policy-driven duties. *See A.O. Smith Corp. v. United States*, 774 F.3d 359, 365 (6th Cir. 2014) ("There is a 'strong presumption' that the second part of this *Gaubert* test is satisfied if a court concludes that the employee was exercising discretion." (citing *Gaubert*, 499 U.S. at 324)). "Judicial intervention in such decisionmaking through private tort suits would require the courts to 'secondguess' the political, social, and economic judgments of an agency exercising its regulatory function." *Hawes v. United States*, 322 F. Supp. 2d 638, 645 (E.D. Va. 2004) (citation omitted). "It was precisely this sort of judicial intervention in policy-making that the discretionary function exception was designed to prevent." *Id.* at 645–46.

>Therefore, upon consideration of the foregoing, the court finds that the Government's alleged negligent conduct falls within the discretionary function exception and does not form a proper basis for a lawsuit under the FTCA. Accordingly, the court finds that it lacks subject matter jurisdiction over these actions and must dismiss them.

(ECF No. 186 at 15–22 (*Cohen*).)

Based on the foregoing, the court entered Judgment for the Government in *Cohen*, *Brown*, and *KGOAI* on September 28, 2018. (ECF No. 187 (*Cohen*).) As a result of the September Order and Judgment in *Cohen*, *Brown*, and *KGOAI*, the Government filed the instant Motions to Dismiss on October 1, 2018. (ECF No. 82.)

## II. JURISDICTION

The court has subject matter jurisdiction over this action, pursuant to 28 U.S.C. § 1346(b)(1), which grants district courts original jurisdiction over civil actions against the Government including those brought under the FTCA wherein the Government can be found "liable to a tort claimant to the same extent that a private person would be liable according to the law of the state of the occurrence." *Juaire v. United States*, No. 4:09-cv-709-TLW, 2012 WL 527598, at *10 (D.S.C. Feb. 16, 2012) (citing 28 U.S.C. § 1346(b) and § 2674).

## III. LEGAL STANDARD

A Rule 12(b)(1) motion for lack of subject matter jurisdiction raises the fundamental question of whether a court has jurisdiction to adjudicate the matter before it. Fed. R. Civ. P. 12(b)(1). "Federal courts are courts of limited subject matter jurisdiction, and as such there is no presumption that the court has jurisdiction." *Pinkley, Inc. v. City of Fredrick, Md.*, 191 F.3d 394, 399 (4th Cir. 1999). In determining whether jurisdiction exists, the court is to "regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991) (citing *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)). "The moving party should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Id.* (citation omitted).

As a sovereign, the Government is immune from suit unless it consents to be sued. *United States v. Sherwood*, 312 U.S. 584, 586 (1941). The Government may define the terms and conditions upon which it can be sued. *Soriano v. United States*, 352 U.S. 270, 276 (1957). The FTCA is a waiver of sovereign immunity with certain specific limitations. 28 U.S.C. §§ 1346(b), 1402(b), 2401(b), 2671–2680. The limitations on the FTCA's waiver of sovereign

immunity are to be strictly construed. *Sherwood*, 312 U.S. at 590; *see also Childers v. United States*, 442 F.2d 1299, 1303 (5th Cir. 1971) (holding plaintiff's claim barred by the six-month period limitation of Title 28 § 2401(b) because the provision is entitled to strict construction and equitable considerations do not extend that period).

## IV. ANALYSIS

A. The Parties' Arguments

In their Motions to Dismiss, the Government asserts that "[t]he conduct Plaintiffs challenge in the present cases is precisely the same conduct as that which was challenged in the consolidated companion [*Cohen*, *Brown*, and *KGOAI*] cases." (ECF No. 82 at 2.) Therefore, "[b]ecause the challenged conduct is the same in all five consolidated cases, the reasoning concerning the discretionary-function exception set out in this Court's opinion in *Cohen*, *Brown*, and *Kings Grant Owners Ass'n* applies equally in *Guerra* and *Fulmer*." (*Id.*)

Plaintiffs oppose the Government's Motions asserting that LtCol Childers' testimony demonstrates the following: (1) a ½ Probable Maximum Flood (or "PMF") was the "required spillway design flood" (or "SDF"[13]) for the Semmes Lake dam at the time of the October 3-4, 2015 storm event (*see* ECF No. 86 at 3); (2) the determination of SDF requires objective "evaluation of hazard potential and technical standards; that Army Regulations require reevaluation and validations of the hazard potential classification "every two years by the same person who decides final decision responsibility for the SDF" (*id.* at 5); and that "design flows (flood)" means SDF as that term is used in the mandatory "Performance Standards" for dams in the Army Regulations (*id.* at 6); (3) the installation commander's decision to install a curb to

---

[13] "The design flood of any dam is the flow rate and volume at which the dam must be maintained to allow passage of the design flows (flood) without major deterioration of dam components, damaging erosive undermining action, or loss of stability." (ECF No. 126-6 at 2 (*Cohen*).) "The selection of the design flood should be based on an evaluation of the relative risks and consequences of flooding, under both present and future conditions." (*Id.*)

13

obstruct water from entering the emergency spillway in 2008 resulted in an overall decrease in the spillway capacity for Semmes Lake Dam (*id.* at 7); and (4) the low-level outlet on the primary spillway is part of the structure of the dam, that it was inoperable and in need of repair at the time of the storm event, thereby mandating that the dam "be immediately repaired, breached, or the pool lowered." (*Id.* at 8–9.) As a result of the foregoing, Plaintiffs argue that the Government's "employees violated multiple mandatory Army Regulations that (a) they had no choice but to follow or (b) that were not susceptible to policy analysis grounded in social, economic, or political considerations with respect to the [] challenged conduct." (*Id.* at 10.) In this regard, Plaintiffs argue that the owner of the Semmes Lake and Lower Legion Lake Dams– "the installation commander under AR 420-72 (prior to February 2008) and the garrison commander under AR 420-1 (after February 2008)"–lacked discretion under mandatory Army regulations thereby making the discretionary function exception inapplicable to this action. (ECF No. 86 at 10; *see also id.* at 12–20.) Accordingly, Plaintiffs "request that the Court deny Defendant's motion to dismiss for lack of subject matter jurisdiction." (*Id.* at 21.)

In its Reply, the Government asserts that the instant cases should be dismissed because "[t]he law-of-the-case doctrine warrants application of the legal reasoning that the Court employed in dismissing *Cohen*, *Brown*, and *Estate of Anne Weber Fulmer*." (ECF No. 89 at 2.) The Government argues that LtCol Childers' testimony does not affect the application of the law-of-the-case doctrine because the "testimony is not new, was readily discoverable before judgment, and is merely cumulative and immaterial." (*Id.* at 5; *see id.* at 5–19.) Additionally, the Government argues that "[t]he law of the case applies because there has not been a change in the controlling law, there is no new evidence that was not available before the entry of judgment in *Cohen*, *Brown*, and *KGOAI*, and the Court's dismissal of those cases was not clearly

14

erroneous." (*Id.* at 19.)

B.  The Court's Review

"Under the law of the case doctrine, 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" *Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 655, 664 (D.S.C. 2016) (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988)). "Although the court remains free to deviate from its prior decisions, as the doctrine is discretionary and simply 'expresses the practice of courts generally to refuse to reopen what has been decided,' as a general practice, 'courts should be loath[ ] to [revisit prior decisions] in the absence of extraordinary circumstances.'" *Id.* (quoting *Christianson*, 486 U.S. at 817). Courts generally do not disregard the law of the case doctrine unless: "(1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to the issue, or (3) the prior decision was clearly erroneous and would work manifest injustice." *Id.* (quoting *United States v. Aramony*, 166 F.3d 655, 661 (4th Cir. 1999)).

In the September Order entered in *Cohen*, *Brown*, and *KGOAI*, the court concluded that the discretionary function exception was applicable to Plaintiffs' claims because they were unable to (1) specify a mandatory "federal" statute, regulation, or policy that required a SDF of ½ PMF at Semmes Lake Dam; or (2) demonstrate that any failure by the Government to either operate the Semmes Lake Dam with a ½ PMF or conduct specified maintenance on the Semmes Lake Dam and/or the Lower Legion Lake Dam was a decision made outside of the scope of policy-driven duties. (ECF No. 186 at 21, 22 (*Cohen*).) Thereafter, Plaintiffs urged the court to alter or amend the September Order based on LtCol Childers' testimony, which Plaintiffs

15

asserted establishes that the required SDF for the Semmes Lake Dam was a ½ PMF[14] and that the discretionary function exception is inapplicable in this case because the owner of the Semmes Lake and Lower Legion Lake Dams failed to review or verify the hazard potential classification as required by Army regulations or make any determination that the SDF was anything other than a ½ PMF.[15] (ECF Nos. 191-1 at 13 (citing ECF Nos. 103-3 at 5 § 7-47(c) & 103-4 at 5 § 5-

---

[14]
Q. Turning to paragraph G of your 15-6 investigation report, what was the findings of the government as it relates in paragraph G?
A. To clarify, are you asking the findings of the government or the findings of the - -
Q. The findings of the government in the 15-6 investigation report?
A. The government, meaning the same as Fort Jackson?
Q. Yes, sir.
A. Fort Jackson in the 15-6 findings memo states that 'on 4 October Semmes Lake failed after receiving 13.4 inches of rain in twenty-four hours, which represented approximately sixty percent of the required spillway design flood.'
Q. Okay. And the report uses the term required, correct?
A. That's correct.
Q. Okay. So, Fort Jackson viewed it as a mandatory then, correct?
A. At the time Fort Jackson understood incorrectly the requirement for the spillway design flood for Semmes Lake to be one half of the probable maximum flood.
Q. And the next section that deals with findings related to Lower Legion Lake, is that correct?
A. Yes.
Q. And this is the 15-6 investigation report findings of the Department of the Army, correct?
A. Correct.

(ECF No. 191-3 at 62:10–63:14 (*Cohen*.)

[9]
Q. Okay. In the language that you read, both in 420-72 and 420-1 it states that a hazard classification has to be reviewed and validated every two years, is that correct?
A. That's correct.
Q. Okay. Is it your testimony today that that would be the same at Semmes Lake and at Lower Legion Lake?
. . .
A. Again, the regulation here states, you know, states that classification of installation dams shall be reviewed and validated every two years by the installation commander, later ·changed to garrison commander.
Q. And Fort Jackson is subject to those regulations, correct?

16

6(b)) (*Cohen*) & 200 at 6–8 (*Cohen*).) In considering Plaintiffs' arguments, the court re-reviewed and reconsidered each of the following Army Regulations, Department of the Army ("DA") Pamphlets, and EAPs that were referenced in LtCol Childers' testimony and which form the basis of Plaintiffs' claims alleging that the Semmes Lake and Lower Legion Lake Dams were not maintained as required by mandatory directives:

- AR 420-72 at § 5-5: "Army dams at all CONUS[16] installations will be maintained at or above the minimum condition levels of host State and as specified herein and in the above referenced FEMA[17] documents." (ECF No. 103-4 at 5 (*Cohen*).)
- AR 420-72 at § 5-6(a) & AR 420-1 at § 7-47(b): "All dams must be maintained to allow passage of the design flows (flood) without major deterioration of dam components or damaging erosive or undermining action, nor loss of stability." (ECF Nos. 103-4 at 5, 103-3 at 5 (*Cohen*).)
- AR 420-72 at § 5-6(b): "Final decision responsibility on the design flood/risk analysis shall be the decision of the dam owner, the installation commander." (ECF No. 103-4 at 5 (*Cohen*).)
- AR 420-1 at § 7-47(c): "Final decision responsibility on the design flood and risk analysis shall be the decision of the dam owner, the garrison commander." (ECF No. 103-3 at 5 (*Cohen*).)
- AR 420-1 at § 7-4(b)(5): "Garrison commanders could be held liable for any legal claims, obligations, or liabilities resulting from the failure of a dam, if the commander had not ensured that all legal and safety requirements had been met." (ECF No. 152-5 at 3 (*Cohen*).)
- AR 420-1 at § 7-46: "Classification of each installation's dams shall be reviewed and validated every 2 years by the garrison commander in conjunction with submission of required information for the biennial National Dam Safety Program Progress Report." (ECF No. 103-3 at 5 (*Cohen*).)
- AR 420-1 at § 7-47(a): "Army dams will be maintained at or above the minimum condition levels of host state or host nation and as specified herein." (ECF No. 103-3 at 5 (*Cohen*).)
- AR 420-1 at § 7-5(a): "In providing transportation infrastructure and dam safety services, Army garrisons will comply with all applicable Federal laws and regulations." (ECF No. 126-2 at 9 (*Cohen*).)
- DA Pamphlet 420-1-3 at § 6-4: Garrison commanders may be held personally liable for the safety of the dams under their authority and must fund projects to correct the deficiencies (*see* HQDA, Office of the Chief of Engineers, memorandum Subject Command Responsibility for Dam Safety, dated 17 Aug

---

    A.    They are.

(ECF No. 191-1 at 76:14–77:5 (*Cohen*).)
[16] "CONUS" means the Continental United States. (ECF No. 152 at 11 n.7 (*Cohen*).)
[17] "FEMA" is the acronym for the Federal Emergency Management Agency.

- 1992; available at HQDA, ACSIM (DAIM–OFD). If funding is not available, they will forward requests up the chain of command, with high priority, to get funding for the projects and the responsibility will shift to the next level of authority. (ECF No. 103-9 at 7 (*Cohen*).)
- DA Pamphlet 420-1-3 at § 6-4: "Earthen dams will have vegetation properly controlled and mowed, seepage will be constantly observed and controlled, and erosion repaired. Spillways will be properly maintained and erosion repaired. Outlets will be maintained and controls tested annually." (ECF No. 103-9 at 7 (*Cohen*).)
- 1997 EAP: "The appropriate Spillway Design Flood (SDF) was determined to be ½ the PMF." (ECF No. 103-11 at 9 (*Cohen*).)
- 2010 EAP: "One half of the Probable Maximum Precipitation (PMP) is the required design storm under the South Carolina Rules for Dam Safety for Semmes Lake Dam." (ECF No. 103-12 at 8 (*Cohen*).)

However, notwithstanding Plaintiffs' arguments to the contrary, the court reached the same conclusion that the discretionary function exception was applicable to Plaintiffs' claims:

> Conduct is mandatory when "a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' because 'the employee [then] has no rightful option but to adhere to the directive.'" *Gaubert*, 499 U.S. at 322 (quoting *Berkovitz*, 486 U.S. at 536); *see also, e.g., Nguyen v. United States*, 556 F.3d 1244, 1250 n.2 (11th Cir. 2009) (observing that conduct is mandatory "when a federal statute, regulation, or policy specifically prescribes a course of conduct embodying a fixed or readily ascertainable standard"). The "relevant inquiry is whether the controlling statute or regulation mandates that a government agent perform his or her function in a specific manner." *Hughes v. United States*, 110 F.3d 765, 768 (11th Cir. 1997).
>
> Upon consideration of the foregoing Army Regulations, DA Pamphlets, and EAPs in the context of Plaintiffs' arguments, the court is not persuaded its September Order and Judgment misconstrued the aforementioned as they relate to the applicability of the discretionary function exception.[18] In this regard, the court observes that the above-cited Army Regulations do not appear to convey mandatory directives outlining the precise manner in which dams should be maintained, but rather general guidelines or policy goals. *E.g., Waverly View Inv'rs, LLC v. United States*, 79 F. Supp. 3d 563 (D. Md. 2015) ("For example, DoD Directive 5500.5's declaration that Army activities 'must not adversely affect neighboring civilian populations or the environment[,]' 30 Fed. Reg. at 14909, does not 'specifically prescribe[ ] a course of action for [the Army] to follow' in disposing of TCE and PCE at Fort Detrick, *Berkovitz*, 486 U.S. at 536, 108 S. Ct. 1954."); *Ochran v. United States*, 117 F.3d 495, 500 (11th Cir. 1997)

---

[18] The court notes that its assessment of the applicability of the discretionary function exception based on this combination of Army Regulations, DA Pamphlets, and EAPs appears to be an issue of first impression within this Circuit.

18

("[T]he use of the word 'shall' in describing the responsibilities of the AUSA does not necessarily mean that the Guidelines left no room for the AUSA to exercise judgment or choice."); *OSI, Inc. v. United States*, 285 F.3d 947, 952 (11th Cir. 2002) (Holding that "an agency manual which provides only objectives and principles for a government agent to follow does not create a mandatory directive which overcomes the discretionary function exception to the FTCA"). Moreover, as the court observed in the September Order (*see* ECF No. 186 at 18–21), DA Pamphlets and EAPs generally operate as advisory guidelines. *See also* AR 25-30 at § 3-38 ("Pamphlets are informational in nature and contain guidance or reference material of a continual nature. Pamphlets will not be used to establish policy."); (ECF No. 103-11 at 5(e) ("The purpose of this [emergency action] plan is to: (1) provide guidance on the identification of and associated preventive action for emergency situations at the subject project . . . ."). Therefore, the court is unable to find that either one or a combination of the Army Regulations, DA Pamphlets, and EAPs cited by Plaintiffs is a specific mandatory policy that removes discretion concerning the oversight/maintenance of the Semmes Lake and Lower Legion Lake Dams. The basis for the court's conclusion about the applicability of the discretionary function exception in this action is accurately reflected in the following observation made by a district court in dismissing claims for personal injury from drinking contaminated water:

> The question is not whether Camp Lejeune was under a directive to provide a clean water supply; the question is whether those responsible for the required clean water supply had any discretion in the manner in which that supply was to be achieved. The fact that BUMEDs[19] were orders that had to be followed by the Marine Corps does not mean that the BUMEDs contained specific mandatory instructions for how to achieve a clean water supply that removed any discretion from the part of those responsible for the water supply at Camp Lejeune. There simply is no question here but that there were a myriad of discretionary decisions that had to be made about how to provide clean water at Camp Lejeune.

*In re Camp Lejeune N.C. Water Contamination Litig.*, 263 F. Supp. 3d 1318, 1350–51 (N.D. Ga. 2016).

(ECF No. 203 at 16–18 (*Cohen*).)

In the instant matters, the parties do not appear to dispute that the underlying claims, facts, and Army Regulations, DA Pamphlets, and EAPs at issue are either the same or

---

[19] The court defined "BUMEDs" as "regulations issued by the Navy Bureau of Medicine and Surgery [] as well as other regulations provid[][ing] mandatory duties and specific courses of action with respect to safe water supply." *In re Camp Lejeune N.C. Water Contamination Litig.*, 263 F. Supp. 3d 1318, 1344 (N.D. Ga. 2016).

substantially similar to those presented in *Cohen*, *Brown*, and *KGOAI*. Therefore, no matter whether the law of the case doctrine is applicable or not, the court agrees with the Government that, for the reasons discussed in the September Order (ECF No. 186 (*Cohen*)) and the Order denying Plaintiffs' Motions to Alter or Amend (ECF No. 203 (*Cohen*)), the discretionary function exception is applicable to Plaintiffs' claims in these actions. Accordingly, the court finds that it lacks subject matter jurisdiction over these actions and must dismiss them.

## V.     CONCLUSION

For the reasons stated above, the court **GRANTS** the Government's Motions to Dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction. (ECF No. 82 (*Heilich*); ECF No. 59 (*Sun Suk*).)

**IT IS SO ORDERED.**

*J. Michelle Childs*
United States District Judge

December 21, 2018
Columbia, South Carolina